UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATHERINE DENDEL,

                Petitioner,                      Case Number 12-14153
                                                    Honorable David M. Lawson

v.

HEIDI E. WASHINGTON
and STEPHEN ROBINSON,

                Respondents.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Katherine Dendel, currently on parole, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging her conviction of second-degree murder. The decedent was an infirm person under the petitioner's care. The state's theory was that the petitioner injected the decedent with insulin, which caused his death. The cause of death was contested at trial, with the petitioner arguing that the decedent either died of natural causes, or he committed suicide by injecting himself with insulin. The petitioner was found guilty after a bench trial in the Jackson County, Michigan circuit court, and the case has received considerable attention from the state appellate courts over two issues: (1) whether the petitioner's rights under the Confrontation Clause were violated by the admission of a laboratory report when the reporting technician who performed the tests did not testify (and therefore the petitioner could not cross-examine him); and (2) whether the petitioner's right to the effective assistance of counsel was abridged when her trial lawyer did not hire an expert witness to offer an alternate explanation for the victim's death. The petitioner also argues that there was insufficient evidence offered at trial to support her conviction. The state courts denied relief on both the ineffective assistance of counsel and Confrontation Clause claims because

they determined that the constitutional violations did not prejudice the petitioner.  Other jurists might disagree with those conclusions, and some have expressed that disagreement.  But under the hyper-deferential review standard that federal courts must apply, this Court cannot say that the state courts unreasonably applied Supreme Court precedent.  Therefore, the petitioner is not entitled to relief, and the Court will deny the petition.

<div align="center">I.</div>

This Michigan Supreme Court summarized the facts of the case in the first appeal to that court, as follows:

> Defendant and the victim, Paul Michael Burley, were in a long-term relationship and had lived together for years. Burley had been taking numerous medications for several serious illnesses, including an infection with human immunodeficiency virus (HIV), herpes, hepatitis B and C, epilepsy, ataxia, neuropathy, chronic obstructive pulmonary disease, severely impaired vision, dementia, lymphoma, and throat cancer. Burley was not, however, diabetic. By defendant's own account, Burley was a difficult person to care for. Defendant was solely responsible for making sure that Burley took his medications and for tending to his everyday needs.
>
> Defendant's relationship with Burley's family was strained, apparently by what she perceived as the family's failure to help with Burley's care.  Before Burley's death, defendant had told his sister that "if something happens to your brother, your family won't know what hit you."  About one week before Burley's death, defendant, frustrated with Burley's demands, also told Burley's sister, "I can't take this" and "I feel like giving him a shot of insulin."  As an insulin-dependent diabetic, defendant had access to insulin and knew how to inject it.  Defendant also knew how insulin metabolizes and that no trace of insulin would remain in Burley's blood after an insulin injection.
>
> Defendant had expressed her frustration with caring for Burley to a Family Independence Agency (FIA) employee.  Less than a week before Burley's death, defendant e-mailed the FIA employee to seek help with caring for Burley. Defendant told the employee that she could not manage all of Burley's demands on her own. During a subsequent telephone conversation, defendant again stated that she was frustrated and concerned that the situation was deteriorating and that she no longer knew how to manage Burley.  The FIA employee suggested that defendant have Burley evaluated  at a mental-health facility or have him placed in respite or hospice care.[1]

<div align="center">-2-</div>

---

[1] The FIA employee testified that as long as Burley was competent, the FIA could not compel defendant to put Burley in a nursing home.

---

The FIA employee testified that defendant had never before expressed any problems with caring for Burley. During the week leading up to Burley's death, defendant sought help from the Department on Aging. The department representative told defendant that she did not qualify for help because both she and Burley were not 60 years old. The representative suggested that defendant instead contact hospice services. Defendant replied that hospice services would not help because Burley was not yet near death.

Defendant's care giving situation took another turn for the worse the day before he died. On March 14, 2002, a visiting nurse had been assigned to assist defendant and educate her in the proper methods of care. She visited five times, but, on the day before Burley's death, the nurse terminated her services because Burley had been uncooperative. When the nurse told defendant she was terminating her services, defendant became "quite tearful and upset." Defendant told the nurse that she did not know how long she could continue caring for Burley.

At 3:00 a.m. on the day of Burley's death, defendant called 911, reporting that Burley had been hallucinating and running around with a butter knife. Defendant asked the police to come take Burley to a mental institution. When the police arrived, Burley was sitting calmly in a chair. He told the officers that he was fine and that there was no problem. The police decided to leave Burley at home because he was not a threat to himself or others. One officer testified that defendant was visibly upset with Burley and the police. Defendant also later admitted that she was frustrated with the officers' decision and that she was hoping for relief because she was at her "wit's end."

Defendant contended that later that day she discovered Burley slumped over on the couch and unresponsive. She testified that, because Burley was cold and covered with purple blotches, she thought he might be dead. Rather than calling 911, however, she instead called a friend, who arrived and contacted 911. When the police and emergency personnel were removing Burley's body from the house, one of Burley's sisters telephoned. Defendant answered the phone, but quickly ended the conversation without telling her that Burley had died.

During the next several days, defendant spoke with several of Burley's siblings. She never informed them of his death, but instead falsely told them that he had been hospitalized. One of the victim's sisters described a 74-minute conversation with defendant two days after Burley's death. She testified that defendant was very "upbeat" and "nonchalant" in her discussion of topics ranging from Burley's health

-3-

to antique jewelry.  During this conversation, defendant laughed while describing an alleged incident wh en Burley had wandered away from the apartment complex and become lost.  Yet defendant never announced Burley's death.

Defendant wanted Burley's body cremated without an autopsy being performed.  Although an autopsy was performed despite defendant's wishes, defendant had Burley's body cremated before his family learned about his death.  When a police detective incorrectly told defendant that the medical examiner had detected insulin in Burley's body, defendant called him a liar and explained that insulin could not be detected in the human body after death because it breaks down and depletes naturally.

After defendant's arrest, she told police detectives that Burley had injected himself with insulin.  During a later interview with a police detective, defendant said, "That poor dear, he killed himself for me."  She told the detective that despite Burley's severely impaired vision and problems with holding things, he could inject himself with insulin.[2]

_____
[2] Defendant also suggested the unlikely scenario that if Burley had not injected the insulin himself, perhaps someone had broken into her apartment, found her insulin and syringe, and given Burley the shot.

_____

Defendant also told defense counsel that Burley had killed himself by an insulin injection and that she wanted him to pursue this theory of defense at trial.  Defendant also testified that Burley had mental problems and that he had "talked suicide for 10, 15 years."  She had informed two of Burley's doctors of his suicidal intentions.

Defendant was charged with first-degree murder.  The prosecution theorized at the bench trial that defendant injected the victim with a lethal dose of insulin on April 2, 2002.  The prosecution presented two expert witnesses, Dr. Bernardino Pacris[3] and Dr. Michael Evans,[4] who testified that the evidence supported the theory that Burley had died from an insulin injection rather than from natural causes or an overdose of one of his medications.[5]  Defense counsel Joseph Filip argued that Burley had died either by injecting himself with insulin or from the side effects of numerous medications prescribed for him.  Defense counsel did not present any expert testimony to rebut the testimony of the prosecution's experts.

_____
[3] Dr. Pacris is an Oakland County medical examiner and a former Jackson County forensic pathologist who has been qualified as an expert witness in more than 100 trials.

[4] Dr. Evans is the president and chief executive officer of AIT Laboratories, the former state toxicologist for Indiana, and a professor of toxicology who has testified as an expert in 35 states.

[5] We discuss Dr. Pacris's and Dr. Evans's trial testimony in detail in part III(A) of this opinion.

_____

The trial court found defendant guilty of the lesser-included offense of second-degree murder.  Defendant moved for a new trial, arguing that Filip had deprived her of a fair trial by failing to conduct a reasonable investigation into the cause of Burley's death.  The trial court denied the motion.  The Court of Appeals remanded for a[n evidentiary] hearing to determine whether Filip had provided ineffective assistance.

At the [evidentiary] hearing, appellate defense counsel called Dr. Laurence Simson,[7] who testified that the evidence did not support the view that Burley had died from an insulin overdose.  Dr. Pacris defended his trial testimony that Burley had died of hypoglycemic shock caused by insulin.[8]  The trial court rejected defendant's claim of ineffective assistance of counsel.  Instead, it found that defense counsel's performance had been objectively reasonable.  The court concluded that defendant had not been prejudiced by Filip's failure to call an expert forensic pathologist to rebut the opinions of the prosecution's experts.  The court explained why the outcome of the trial would not have been different if the defense had offered Dr. Simson's testimony:

> And if the case was just, . . . the police had a dead body and you have Dr. Pacris and Dr. Simson, that would be one thing.  It wasn't that.  If there was a lot of other testimony, of statements and other witnesses and other things that pointed in that direction, it would have made the testimony of Dr. Evans and Dr. Pacris not as . . . clear.  But I don't know that I can say that there's a reasonable probability that the outcome would have been different.  There was still — there was other evidence, . . . admittedly all circumstantial, but there was a lot of other evidence.  I am not convinced that that has been established, that it's reasonably probable that the outcome would have been different. . . .

*People v. Dendel*, 481 Mich. 114, 117-122, 748 N.W.2d 859, 860-63 (2008) (footnote omitted).

Following the denial of the motion for new trial, the case proceeded to the Michigan Court of Appeals. The petitioner's appellate counsel filed a brief raising three claims: (1) the admission of the lab report violated her Confrontations Clause rights; (2) the petitioner was denied the effective

assistance of counsel; and (3) the trial court erred in convicting her of second-degree murder when the evidence showed she was either guilty of first-degree murder or was not guilty of any offense. On July 18, 2006, the Michigan Court of Appeals reversed the conviction, finding that the petitioner was denied the effective assistance of counsel. *People v. Dendel*, 2006 WL 2000148, at *3 (Mich. Ct. App. July 18, 2006).

On May 28, 2008, the Michigan Supreme Court reversed the decision of the intermediate appellate court, finding that the petitioner did not show prejudice caused by her lawyer's deficient performance, and therefore she was not denied the effective assistance of counsel. *Dendel*, 481 Mich. at 126, 748 N.W.2d at 865. The court remanded the case to the Michigan Court of Appeals for consideration of the remaining two issues. *People v. Dendel*, 481 Mich. 1201, 750 N.W.2d 165 (2008).

On remand, the court of appeals rejected the petitioner's remaining claims and affirmed her conviction and sentence. *People v. Dendel*, 2008 WL 4180292 (Mich. Ct. App. Sept. 11, 2008).

The petitioner then filed an application for leave to appeal in the Michigan Supreme Court. On February 24, 2009, the Court held the case in abeyance pending the decision of *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). *People v. Dendel*, 760 N.W.2d 482 (2009). Then, on October 7, 2009, the Michigan Supreme Court remanded the case once again to the Michigan Court of Appeals for review of her Confrontation Clause claim in light of *Melendez-Diaz*, but it denied leave to appeal the other remaining issue. *People v. Dendel*, 485 Mich. 903, 773 N.W.2d 16 (2009).

On August 24, 2010 the court of appeals held that the trial court violated the Confrontation Clause per *Melendez-Diaz*, but also held that the error was harmless beyond a reasonable doubt. *People v. Dendel*, 289 Mich. App. 445, 797 N.W.2d 645 (2010).

The petitioner once more appealed to the Michigan Supreme Court, and the appeal was again held in abeyance pending the decision in *Michigan v. Bryant*, --- U.S. ---, 131 S. Ct. 1143 (2011). *People v. Dendel*, 793 N.W.2d 240 (2011). The Michigan Supreme Court then denied leave to appeal on September 21, 2011. *People v. Dendel*, 490 Mich. 870, 802 N.W.2d 618 (2011).

The petitioner then filed a timely petition for a writ of habeas corpus raising these issues:

I.      THE   AIT   LAB   RESULTS   ARE   TESTIMONIAL   UNDER *MELENDEZ-DIAZ* AND THEIR ADMISSION THROUGH DR. EVANS, WHO DID NOT PERFORM THE TESTS, VIOLATED MS. DENDEL'S RIGHT TO CONFRONT HER ACCUSER.

II.     MS. DENDEL'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHERE TRIAL COUNSEL (A) FAILED TO INVESTIGATE AN ALTERNATIVE CAUSE OF DEATH OTHER THAN HYPOGLYCEMIA, AND (B) FAILED TO CALL ANY MEDICAL EXPERT WITNESSES.

III.    THE EVIDENCE PRESENTED WAS INSUFFICIENT TO SUSTAIN MS. DENDEL'S SECOND-DEGREE MURDER CONVICTION.

Pet. at 21, 27, 41. The respondents filed an answer to the petition, arguing that the state courts correctly decided the issues. The respondents also filed a supplemental response, calling the Court's attention to *Frazier v. Jenkins*, 770 F.3d 485 (6th Cir. 2014).

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Dendel filed her petition after the AEDPA's effective date, its standard of review applies. Under

that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions."  *White v. Woodall*, --- U.S. ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014);

-8-

*Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the record that was before the state court."  *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

### A.

Relying on *Melendez-Diaz v. Massachusetts,* 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, --- U.S. ---, 131 S. Ct. 2705 (2011), the petitioner argues that the admission of laboratory test results performed by AIT Laboratories during Dr. Evans's testimony violated her rights under the Confrontation Clause because the technician who performed the laboratory analysis did not testify at trial and was not available for cross-examination.  The respondents assert the untenable position that no Confrontation Clause violation occurred, based on clearly established Supreme Court law existing at the time the Michigan Court of Appeals rejected this claim.  Alternatively, the respondents assert that any error was harmless.

The Confrontation Clause of the Sixth Amendment, which is applicable to the States through the Fourteenth Amendment, *Idaho v. Wright*, 497 U.S. 805, 813 (1990), guarantees a defendant in a criminal prosecution "the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."  *Giles v. California*, 554 U.S. 353, 358 (2008) (citing *Crawford*

*v. Washington*, 541 U.S. 36, 68 (2004)). "Testimonial" evidence includes, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and [] police interrogations." *Crawford*, 541 U.S. at 68.

In *Melendez-Diaz v. Massachusetts*, the Supreme Court held that affidavits and state laboratory analysts' certificates were "testimonial" statements subject to the requirements of the Confrontation Clause. 557 U.S. at 310-311. The Court reasoned the analysts' statements were made in affidavits or their equivalent, and therefore "f[e]ll within the 'core class of testimonial statements'" described by *Crawford*. *Id.* at 310. The Court explained that affidavits, like sworn testimony in a preliminary hearing or a grand jury proceeding, "are incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Ibid.* (quoting *Crawford*, 541 U.S. at 51). Therefore, the Court held, the defendant had a right to cross-examine the analysts who performed the laboratory tests.

In *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2709 (2011), the Court held that the Confrontation Clause is not satisfied by "surrogate testimony" from another analyst at the laboratory, when the witness, although familiar with the testing protocols at the lab, was not the person who performed the tests. 131 S. Ct. at 2710. The report in that case was made on a state form on which the analyst "certified" his results, although the paper was not notarized. Although the lower courts acknowledged that such certificates were "testimonial" in the same way as the certificates in *Melendez-Diaz*, the Court considered and rejected New Mexico's argument that the certificates should not be considered testimonial because they "were not 'adversarial' or 'inquisitorial'; instead, they were simply observations of an 'independent scientis[t]' made 'according to a non-adversarial public duty.'" *Id.* at 2717 (citations omitted). A plurality of the

-10-

Court noted that "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Id.* at 2714 n.6 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).  Following that definition, and the instruction in *Michigan v. Bryant*, 562 U.S. 344, 358 (2011), that an out-of-court statement is "testimonial" if "it has 'a primary purpose of creating an out-of-court substitute for trial testimony,'" *Bullcoming*, 131 S. Ct. at 2720 (Sotomayor, J., concurring), the Court observed that "the formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the analyst's] assertions as testimonial.  The absence of notarization does not remove his certification from Confrontation Clause governance."  131 S. Ct. at 2717.

Noting that *Bullcoming* had not been decided when the Michigan Court of Appeals addressed the Confrontation Clause issue, and drawing on the distinction between notarized and non-notarized documents, the respondents maintain that no clearly established Supreme Court authority would have rendered the AIT Laboratories report a testimonial statement, thereby triggering the Confrontation Clause requirements.  It is true that the law that state courts must follow is clearly established Supreme Court law as it existed "at the time of the state-court adjudication on the merits."  *Greene v. Fisher*, --- U.S. ---, ---, 132 S. Ct. 38, 43 (2011); *see also Miller v. Stovall*, 742 F.3d 642, 644-45 (6th Cir. 2014).  However, the distinction that the respondents try to assert between notarized and non-notarized declarations in laboratory reports is not a meaningful one.  The definition of a testimonial statement finds its source in *Davis v. Washington*, decided well before the Michigan Court of Appeals addressed the issue.  There, the Court established that out-of-court statements are testimonial if their "primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution."  *Davis*, 547 U.S. at 822.  The presence or absence

of an oath has never figured into the definition.  In fact, the statements declared unconstitutionally admitted in *Crawford* were not notarized or otherwise made on oath; they were tape recorded conversations made by a police officer.  *Crawford*, 541 U.S. at 38-39.  And the Michigan Court of Appeals, like the state courts in *Bullcoming*, agreed that the laboratory reports were testimonial.  The absence of notarization never entered the picture.  The AIT Laboratories report in this case was testimonial according to clearly established Supreme Court precedent extant at the time of the relevant state court decisions.

The controlling question on this issue, however, is whether the erroneous admission of the report was harmless.  The state court of appeals held that it was.  Under federal law, violations of the Confrontation Clause are subject to harmless-error analysis.  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007).  Habeas relief may be granted only if a constitutional error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless.  And, the petitioner must win."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  Whether a violation of the Confrontation Clause was harmless error depends on a number of factors, including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Van Arsdall*, 475 U.S. at 684.

-12-

In this case, the substance of the AIT Laboratories report was that the victim's post-mortem glucose level, measured in the vitreous humor, was zero, which supported the prosecutor's theory that he died from an insulin injection rather than some other form of drug overdose.  The state court acknowledged that the report was important evidence for the prosecution, but it pointed to other evidence in the record that also established the points for argument, suggesting that the AIT Laboratories report may have been cumulative.  For instance, Dr. Pacris testified based on his own examination and testing that there was a lack of glucose in the victim's bodily fluids. The expert testimony indicated that a sudden drop of glucose levels is expected immediately after death, but that a complete lack of glucose suggested that the victim had been injected with insulin.  Dr. Pacris also opined that the victim died of hypoglycemic shock based on his observation of acute tubular necrosis in the kidneys and dead cells in the proximal tubules of the brain.  He testified that hypoxic changes to the brain, including red neurons on the hippocampus, are only manifested if the person has been comatose for about 12 hours, which was inconsistent with the petitioner's version of events on the date of his death.  That evidence was based on his own personal observations and testing.

Moreover, defense counsel took the position at trial that the victim had died either by injecting himself with insulin or from the side effects of numerous medications prescribed for him. As noted by the respondents, the importance of the report indicating zero-glucose findings tended to fade in the light of this defense, which accounted for the findings in the report.  Defense counsel used the finding in the report of high levels of morphine found in the body to support the defense.

Finally, there is the deference that must be paid to the state court's reasoning that admission of the report was harmless.  "The deferential posture of § 2254(d)(1) is understood to be 'subsume[d]' within *Brecht* review, which is itself deferential." *Blackston v. Rapelje*, 780 F.3d 340,

-13-

359 (6th Cir. 2015) (citing *Fry v. Pliler*, 551 U.S. 112, 117 (2007)).  Although one could easily take issue with the state court's harmless error analysis, one could not say that its reasoning "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.  Therefore, the petitioner is not entitled to relief on this claim.

<p style="text-align:center">B.</p>

The petitioner contends that her Sixth Amendment rights were abridged because defense counsel failed to hire an expert witness and pursue a defense challenging the prosecutor's theory of the cause of death.  The state courts found that defense counsel's performance was deficient, but the state supreme court held that the petitioner could not show prejudice.  The respondents argue that the state court reasonably adjudicated the claim.

To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*,  556 U.S. 111, 122 (2009).  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  To establish prejudice from counsel's failure to investigate or call a potential witness, a petitioner must show that had the witness testified, "the result of the proceeding would have been different." *Landrum v. Mitchell*, 625 F.3d 905, 921 (6th Cir. 2010) (quoting *Strickland*, 466 U.S at 694).

The Michigan Supreme Court found that defense counsel's failure to call an expert witness on the cause-of-death issue was not prejudicial.  The trial court reached that same conclusion after

<p style="text-align:center">-14-</p>

conducting a post-conviction hearing, at which the petitioner called an expert pathologist, Dr. Lawrence Simpson, who challenged the state's experts' conclusions. The trial judge, who had been the factfinder at the petitioner's bench trial, said that his judgment would not have been different had Dr. Simpson testified at trial. The state supreme court did not rely on that first-hand account of the decision-making process; instead, it viewed the record, it said, objectively. *People v. Dendel*, 481 Mich. at 132 n.17, 748 N.W.2d at 868 n.17.

In concluding that no prejudice was shown, the state supreme court discussed much of the same evidence mentioned above, discounting the proposed defense expert as a mere makeweight in the defense strategy. The court noted that the trial court had made an implicit finding that neither expert witness was more credible than the other. Dr. Simpson opined that the pathological and toxicological findings did not support the view that the victim had died of hypoglycemia. But Dr. Pacris later defended his position by discounting the defense expert's theory that the relevant changes in the victim's body were simply due to general decomposition. The court noted that it was significant that the defense expert ultimately conceded the possibility that the victim had died from insulin overdose. Based on the record developed at the evidentiary hearing, the court was not "left with the definite and firm conviction" that the trial court erred in finding that Dr. Simpson, the defense expert, was not more credible than Dr. Pacris and Dr. Evans. The court further noted that the petitioner's own statements regarding the victim giving himself an insulin injection supported the theory of the prosecution's experts. Those statements were also inconsistent with the defense expert's theory of death.

The petitioner advanced a very persuasive case that she was prejudiced by her lawyer's failure to call an expert witness at trial. Dr. Simpson's testimony did not conclusively establish

-15-

innocence, but it cast considerable doubt on the state's theory that Paul Michael Burley died from

an insulin overdose.  However, because of the high deference accorded state court determinations

by AEDPA, establishing that counsel was ineffective and, therefore, the petitioner was denied her

right to counsel under the Sixth Amendment, is difficult.  The Supreme Court explained in *Richter*

that

> "[s]urmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*,
> 559 U.S. 356, 372 (2010). . . . The question is whether an attorney's representation
> amounted to incompetence under "prevailing professional norms," not whether it
> deviated from best practices or most common custom.  *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under §
> 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d)
> are both "highly deferential," *id*., at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7
> (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556
> U.S., at 123.  The *Strickland* standard is a general one, so the range of reasonable
> applications is substantial.  *Ibid*.  Federal habeas courts must guard against the
> danger of equating unreasonableness under *Strickland* with unreasonableness under
> § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions
> were reasonable.  The question is whether there is any reasonable argument that
> counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

In other words, on habeas review, "[t]he question 'is not whether a federal court believes the

state court's determination' under the *Strickland* standard 'was incorrect but whether that

determination was unreasonable — a substantially higher threshold.'"  *Knowles*, 556 U.S. at 123

(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  Moreover, "because the *Strickland*

standard is a general standard, a state court has even more latitude to reasonably determine that a

defendant has not satisfied that standard."  *Ibid*. (citing *Alvarado*, 541 U.S. at 664).

The petitioner has not overcome the high bar set by the Supreme Court's AEDPA

jurisprudence.  The opinion of the Michigan Supreme Court at least presents a "reasonable

argument" that the petitioner's lawyer's defective performance did not prejudice her defense. Although other jurists might disagree, this Court must be governed by the instruction that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. at 773.

Because the Court cannot say that the state court's determination was contrary to or unreasonably applied governing federal law, habeas relief on the second claim must be denied.

## C.

Finally, the petitioner asserts that insufficient evidence was presented at trial to sustain her conviction for second-degree murder. The respondents argue that this claim is unexhausted because it was never fairly presented to the state courts as a federal claim, but it was presented as a state-law claim regarding the improper use of a lesser-included offense. The respondents argue in the alternative that the claim lacks merit.

Under 28 U.S.C. §2254(b)(2), the Court may deny a claim on the merits despite non-exhaustion. "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In a habeas corpus proceeding, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16)).

-17-

"A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law, the elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse. Mich. Comp. Laws § 750.317; *People v. Goecke*, 457 Mich. 442, 474, 579 N.W.2d 868, 878 (1998) (citing *People v. Bailey*, 451 Mich. 657, 669, 549 N.W.2d 325, 331 (1996)). Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to perform an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm. *Id*. at 464, 579 N.W.2d at 878 (citing *People v. Aaron*, 409 Mich. 672, 678, 299 N.W.2d 304, 326 (1980)). Malice may be inferred from evidence that a defendant intentionally set in motion a force likely to cause death or great bodily harm. *People v. Djordjevic*, 230 Mich. App. 459, 463, 584 N.W.2d 610, 612 (1998).

At the petitioner's trial, Dr. Pacris testified that the victim died because of hypoglycemic complications. He pointed to hypoxic findings in the brain, kidneys, and the zero glucose level to determine the cause of death. Dr. Evans testified that the zero glucose level is consistent with an insulin injection. His testimony regarding the report generated at the laboratory is relevant to the

-18-

sufficiency-of-evidence analysis despite its arguable improper admission. *United States v. Stokes*, 631 F.3d 802, 807 (6th Cir. 2011).

Therefore, there was sufficient evidence presented to establish that the victim died as the result of an insulin injection. And circumstantial evidence pointed to the petitioner as being the person who injected the victim with the insulin. The evidence, viewed most favorably to the prosecution, showed that the victim was too weak to administer his own injection, and the petitioner was the only other person present. As for motive, the evidence presented showed that the petitioner was overwhelmed with her work and responsibility to care for the ailing victim. There was also evidence presented that the petitioner had six life insurance policies on the victim. She attempted to find other resources to help with the victim's care, but was unable to do so. The petitioner's behavior after the victim's death also provided circumstantial evidence of a guilty state of mind. After the paramedics arrived to collect the body, the petitioner said she did not want an autopsy and did not want the victim's family contacted.

Viewed most favorably to the prosecution, therefore, the evidence presented at trial allowed the factfinder to determine beyond a reasonable doubt that the petitioner caused the death of the victim, acting with malice and without justification or excuse. Habeas relief is not warranted on this claim.

### III.

For the reasons stated, the Court finds that the petitioner has not established that she is in custody in violation of the Constitution or laws of the United States.

-19-

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 22, 2015

<div style="border:1px solid black; background:#ccc; padding:10px;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 22, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI

</div>